### BIMBO v. UNITED STATES.
#### No. 6506.

United States Court of Appeals for the District of Columbia.

Decided Feb. 10, 1936.

Nugent Dodds and Thomas E. Rhodes, both of Washington, D. C., for appellant.

Roger Robb, of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

MARTIN, Chief Justice.

The appellant, Tene Bimbo, a Gypsy, was convicted and sentenced in the Supreme Court of the District of Columbia upon an indictment charging that on June 13, 1933, he did steal, take, and carry away the sum of $130 in money, the property of the Woodridge-Langdon Savings & Commercial Bank, a body corporate, located in the District of Columbia.

The defendant pleaded not guilty, and relied in part for his defense upon an alibi.

claiming that he was not in the District of Columbia but in the city of New York at the time named in the indictment.

At the trial the government produced as a witness one Weckerly who testified in substance that he was the bank's teller at the time in question and was then on duty behind the counter at the bank, and that a man, a Gypsy, came into the bank with eight fifty-dollar bills and asked Weckerly for change for them. Weckerly had difficulty in understanding the man as he did not speak good English. Weckerly understood the man to ask for ten-dollar bills in change, and he counted out forty ten-dollar bills, counting them over twice, and pushed them out of the window of the cage on the counter towards the man. The man put his hands on them, having one hand on top of the bills and the other hand beneath the bills, and moved his hands back and forth with the bills between them. The man then shook his head and said he did not want the change that way. Weckerly could not understand him and the man asked him if he spoke Spanish. Weckerly replied that he did not. A Mr. McPhaul, a customer of the bank who was standing behind the man said he understood him to want fives and ones, and Weckerly then counted out $250 in fives and $150 in ones which he passed out to the man and the man handed back a sheaf of ten-dollar bills which Weckerly thought contained all the bills which he had originally given to the man; that Weckerly returned these bills to his till without counting them, and the man took the fives and ones and immediately left the bank; that the occurrence had been witnessed by Mr. Norris, conservator of the bank; that immediately after the man left the bank and at Mr. Norris' suggestion Weckerly counted the ten-dollar bills in his till, and instead of having about forty-five as he should have had, he had about thirty. Weckerly testified that after he had taken the forty ten-dollar bills out of his drawer he had four or five ten-dollar bills left in the drawer as best as he could tell, but after he returned the ten-dollar bills to his drawer and counted them he knew right away he did not get all the money back from the man, so he ran out of the bank but saw no sign of him.

On cross-examination Weckerly said that he remembered distinctly counting the forty ten-dollar bills twice before giving them to the man; that all the time the ten-dollar bills were on the counter they were in plain view; that the money was partly off the counter because the man had one hand on top of the bills and the other on the bottom of the bills, and it was taken part way off the counter. He testified that he did not count the forty ten-dollar bills when they came back to him because the transaction took but a "fraction of a minute" and he felt sure that all of the money was on the counter as he was watching it at the time. Weckerly said that he was short according to his records in the sum of $130; that when the man had his hands on the money he did "quite a bit of reversing them"; and that his movements were slow. Weckerly also testified that the defendant resembled the man who got the money, but that the man seemed to be taller than the defendant, and that he could not positively identify him; that he had failed to identify him when the defendant was first arrested in New York.

The government next produced as a witness Mr. Norris who was present at the time of this transaction and who testified that he looked into the cage and saw that Weckerly was "a little befuddled"; that he told Weckerly that the man was "trying to pull a fast one on him" and to be careful and that Weckerly said that he was and that he was sure that he was all right; that the man was in front of him and he called him back and asked him what he wanted with the change, and the man replied in broken English that he was a banana merchant from South America. The witness positively identified the defendant as the man who got the money.

The government then called Frank McPhaul who testified in substance that he was a railway postal clerk and on June 13, 1933, was in the Woodridge-Langdon Bank about noon to cash a personal check; that he went to the teller's window and Weckerly was in that cage; that a man ahead of the witness was getting change and evidently was undecided what he wanted and passed the money back and forth several times; that the man used the word "peso" and that the teller seemed to be confused so that the witness told the teller the man wanted dollar bills and the man bowed and thanked him for interpreting; that Mr. Norris came to the cage and asked the teller about the transaction; that the man was in front of the cage and the witness was right behind him and they were the only persons there at that time; that witness never saw the man afterwards until in a po-

lice line-up at the courthouse and he identified him at that time as the man who received the money from Weckerly at the time in question; that he had no doubt of his identity.

The government also called Norman A. Bell as a witness, who was a bookkeeper at the bank at the time of the transaction in question. He testified that at that time he was working in the cage next to that of Weckerly; that he heard some foreign language spoken in the lobby of the bank, which witness took to be Spanish; that witness had a smattering of Spanish at school and looked up and saw the man at the window; the witness looked up right away and gave his full attention to what was going on; that the witness heard the man say "cinco" and "diez," which in Spanish is five and ten; that witness thought he could help Weckerly in giving the man the change he wanted; that the money given at first was not the change the man wanted and in plainer English he told Weckerly he wanted twenties instead of what he got; that in the meantime the man was telling how much larger a bunch of bananas could be obtained at the same price in South America than in the United States; that after receiving the money to his satisfaction the man walked out of the bank; the witness testified that the defendant was the man who received the money. He was asked to leave the stand and place his hand on the shoulder of the defendant, whereupon he placed his hand on the shoulder of Steve Bimbo, the son of the defendant who sat beside the defendant at the trial table, both being in front of the witness stand. It was afterwards testified in rebuttal by witness William McEwan that at the time when Bell placed his hand upon the shoulder of the defendant's son, the defendant had his hand over his own face.

The defendant in support of his alibi asserted that he was in New York City the entire month of June, 1933, and was not at any time in that month present in the District of Columbia. It seems proper therefore at this point to add the testimony of two rebuttal witnesses who testified that they saw defendant on the outskirts of the District of Columbia on June 14, 1933, the day following this transaction. These witnesses were Edward C. Holmead and H. C. McCeney. They testified that they were at the time employed as tellers in the Silver Spring National Bank, Silver Spring, Md., a village immediately north and adjacent to the District of Columbia line. They testified in substance that the defendant Bimbo came into their bank on that date and produced $550 in fifty and hundred-dollar bills and asked for change in tens and twenties and started some line of conversation. The witnesses had read newspaper accounts of the transaction at the Woodridge-Langdon Bank on the preceding day and started to call the police, whereupon Bimbo seemed to get excited and in a hurry to get out and asked for tens and went out, having first asked for tens and twenties, leaving the bank hurriedly. He went down the street about a block and got into his car without being followed. These witnesses positively identified the defendant as the man who came to their bank on June 14 to get money changed.

The defendant in support of his alibi first examined as witnesses four of his relatives, to wit, Louis Tene Bimbo, his grandson; Steve Bimbo, his son; Adolph Bimbo, also his son; Peggy Fisk, his daughter; and, in addition to these, George Stanley, also a Gypsy and a friend of defendant. These witnesses all testified that June 13, 1933, was a festival day for Gypsies and that on that day the defendant gave a great feast for many Gypsies in New York City; that defendant was present during the entire day at this feast.

The defendant also called as witnesses Joseph Burger and Blanche Burger, sister of Joseph, who testified that they had seen the defendant in New York City on June 13, 1933; that Joseph Burger, a shoe maker, had delivered a pair of shoes to defendant on that day; and that Blanche Burger had collected rent from defendant for the room occupied by him on the same day.

The defendant himself testified that he was present during this entire feast and was in New York during the entire month of June, 1933, and had not been in the District of Columbia, nor Silver Spring, Md., at any time during that month.

In the cross-examination of Adolph Bimbo, son of the defendant, he was asked whether on or about June 22, 1934, he had paid to Weckerly the sum of $130 to secure from him an affidavit to the effect that Weckerly did not recognize his father as the man who received the money at the bank. In answer to this question Adolph testified that he had not paid $130 to Weckerly, but had paid $150 to Mr. Fowler, an attorney. Weckerly being called as a witness in rebuttal, testified that in June, 1934,

in the presence of Adolph Bimbo at Mr. Fowler's office Weckerly was paid the sum of $130 and thereupon delivered his affidavit to the effect that he did not recognize Adolph's father as the man who received the money.

■ The appellant assigns as error that there was a total failure of evidence submitted by government in proof of the statement in the indictment that the Woodridge-Langdon Savings & Commercial Bank was a body corporate. We think, however, that this assignment is not well taken. The witness Norris testified that on June 13, 1933, the bank was a corporation and he had been appointed as conservator of it. A facsimile of the corporate seal of the bank was produced in evidence. This was sufficient evidence to establish the existence of the corporation, for the corporate character of the bank may be proved by parol evidence of an officer or other person acquainted with the fact. Swann v. Commonwealth, 169 Ky. 565, 184 S.W. 868; State v. Rozeboom, 145 Iowa, 620, 124 N.W. 783, 29 L. R.A.(N.S.) 37; Fields v. United States, 27 App.D.C. 433; State v. Pittam, 32 Wash. 137, 72 P. 1042. "Although on a prosecution for a crime with respect to the property of, or otherwise against, an alleged corporation, either domestic or foreign, there must be some evidence of corporate existence as alleged, unless there is some statute dispensing therewith, as in the case of a statute requiring the allegation of corporate existence to be denied under oath, it is generally sufficient to prove a de facto corporate existence, and this may be prima facie shown by proving a charter, a certificate of incorporation, or a license to do business in the state and user under it, by showing ratification or recognition of the alleged corporation by an act of the legislature, or in most jurisdictions even by parol evidence of incorporation or of user or reputation without proving the statute or instrument of incorporation or organization thereunder, even though a statute makes the certificate of the secretary of state prima facie evidence of incorporation, if it does not expressly exclude other evidence. [Cases cited.]" 14 C.J. 175.

■■ It is also contended by appellant that inasmuch as Mr. Norris was conservator of the bank the title to the money in question was in him and not in the bank, that consequently title of the property alleged to have been stolen was not properly laid in the indictment. This charge, however, is not well taken. The ultimate ownership of the assets of the bank was in the corporation. Moreover, if there was a variance in the proof and allegation concerning the ownership of the money, it was harmless under section 269 of the Judicial Code as amended. 28 U.S.C. § 391 (28 U.S.C.A. § 391).

■ The appellant charges that the evidence, even though accepted as true, did not support the charge of larceny. We think this charge is not sustained. If the defendant asked the teller to change certain money for him and thereby wrongfully and furtively and by means of trickery secured possession of $130 actually belonging to the bank, and if this was done pursuant to his purpose to acquire and retain possession of the bank's money without the knowledge or consent of the bank, or its officers, the crime committed by him would be larceny. John v. United States, 65 App.D.C. 11, 79 F.(2d) 136; Means v. United States, 62 App.D.C. 118, 65 F.(2d) 206; Levy v. State, 79 Ala. 259; Finkelstein v. State, 105 Ga. 617, 31 S.E. 589; Hildebrand v. People, 56 N.Y. 394, 15 Am.Rep. 435.

■ The appellant complains of the cross-examination of Adolph Bimbo and the rebuttal testimony respecting the same. Adolph Bimbo was one of the witnesses who testified that his father, the defendant, was present at the feast in New York on June 13, 1933, and therefore could not have been in the District of Columbia on that day. By way of impeachment of his testimony and of his character as a witness the government showed that at a time following the indictment of his father for this crime and prior to the time of his arraignment, the witness, Adolph Bimbo, had paid to Weckerly the sum of $130, being the amount of the alleged larceny, and had then received from him an affidavit signed by Weckerly to the effect that he did not recognize the defendant as the man who secured the money from the bank in June, 1933. This testimony was not offered and it was not used as independent evidence tending to show the guilt of defendant. It was offered and used solely as evidence tending to impeach the witness whose testimony was introduced by defendant for the purposes of proving the alibi. The cross-examination of Adolph Bimbo and the impeaching evidence were competent as reflecting upon the weight to be given to his testimony as a witness. The comments made by the government's counsel upon this

subject in his address to the jury were likewise so limited and were not improper. Nor was any objection made or exception taken to them. Blockburger v. United States (C.C.A.) 50 F.(2d) 795; State v. Lunsford, 177 N.C. 117, 97 S.E. 682; State v. Martinsen, 198 Iowa, 1325, 201 N.W. 1; State v. Cerar, 60 Utah, 208, 207 P. 597; Commonwealth v. Gallagher, 126 Mass. 54.

█ It is also contended by appellant that the evidence does not sustain the verdict of the jury. We think, however, that the evidence is clearly sufficient to sustain the conviction. In this conclusion we agree with the trial justice and the jury, who saw all the witnesses and heard all of the testimony.

It is contended by appellant that the court erred in refusing to give certain requests of defendant as instructions to the jury. We have examined the general charge of the court and find that it fully and correctly covers the issues in the case.

In our opinion appellant's assignments of error do not disclose any substantial error to his prejudice. The judgment of the lower court is therefore affirmed.

Affirmed.