**LONEY v. UNITED STATES.**

No. 2958.

Circuit Court of Appeals, Tenth Circuit.

Aug. 23, 1945.

Rehearing Denied Sept. 13, 1945.

D. A. Skeen, of Salt Lake City, Utah (Sam D. Thurman, of Salt Lake City, Utah, on the brief), for appellant.

Scott M. Matheson, Asst. U. S. Atty., of Salt Lake City, Utah (Dan B. Shields, U. S.

Atty., and John S. Boyden, Asst. U. S. Atty., both of Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS and MURRAH, Circuit Judges, and SAVAGE, District Judge.

PHILLIPS, Circuit Judge.

Loney was charged by indictment containing 33 counts with violations of 18 U.S.C.A. § 82, which makes it unlawful for a person to take and carry away, or to take for his own use or the use of another, with intent to steal or purloin, any property of the United States. The trial court directed verdicts of not guilty on counts 1, 2, 3, 4, 32, and 33; the jury found Loney guilty on counts 7, 8, 9, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, and 27, and returned verdicts of not guilty on the remaining counts. The trial court sentenced Loney to imprisonment for a term of three years on each of the counts on which he was found guilty, the sentences to run concurrently.

Shortly after the outbreak of the war with Japan, the United States government decided to construct a large storage area for the Army at Ogden, Utah. It is known as Utah Army Service Forces Depot. It will be referred to hereinafter as the Area. It covers approximately 1800 acres. It is a complete storage base with gigantic warehouses and other auxiliary buildings. To obtain the lumber for this construction, the Army Engineers sent their agents to an organization known as "The West Coast Lumber Office," a branch of the War Production Board created for the purpose of controlling the lumber produced within the continental limits of the United States. The various producers and brokers of lumber assembled for the purpose of disposing of lumber under government supervision and requirements. The agents of the Army Engineers had lists of the grades and kinds of lumber necessary for the construction projects at the Area. The government froze all available lumber, fixed the price and controlled the shipping, the ultimate use, and the disposition of the lumber. However, because of the restrictions imposed by the Walsh-Healey Act,[1] the Army Engineers required the construction contractors to purchase for their contracts the lumber allocated to them by the United States government. Lumber purchased by contractors in excess of their requirements was turned over to the United States. In some cases, the government, in order to build up large stock piles of lumber, required a contractor to thus purchase quantities of lumber largely in excess of the requirements for his contract. In that way, the government obtained lumber, notwithstanding the restrictions of the Walsh-Healey Act. Many trainloads of lumber were transported from the Northwest to the Area.

Loney was an employee of the United States government at the Area. The Area Engineer had charge of the Area. Loney's duties were assigned by the Area Engineer, directly or indirectly, and Loney was supervised in the same manner. The Area Engineer placed Loney in charge of the yards set aside for lumber storage. His duties generally were to receive and store lumber directly from cars being shipped into the Area and excess lumber returned by the various contractors who had construction jobs within the Area. He was required to stack and care for the lumber and to keep it moving out to meet the requirements of the various construction jobs at the Area. His activities were supervised only in a general way. He was in charge of large-scale operations and had authority to clear loads of lumber past the guards for delivery to other government construction points within the Utah District.

Major Leonard C. Treman was the Quartermaster at the Area. His duty was to provide supplies and material for the construction of packing boxes for overseas shipments. As Quartermaster, he purchased lumber outright in carload shipments and stored it adjacent to the Area Engineer's lumber yard. All the lumber in the Quartermaster's yard was purchased by and belonged to the United States. In order to aid each other in meeting the lumber requirements of the Army at the Area, extensive exchanges of lumber were informally carried out between Major Treman and Loney. Loney made reports of these exchanges to Major Treman who accepted Loney's reports without checking or investigating them.

When a building was completed on the Area the contractor was required to clean up the premises. Lumber left over that would not be accepted by the United States as surplus lumber was gathered in piles known as salvage piles. Major Treman authorized this salvage lumber to be sold for $1 per load. Loney and others took

---

[1] 41 U.S.C.A. §§ 35–45.

advantage of this authorization and purchased salvage lumber at $1 per load.

Count 19 charged that Loney took and carried away, for his own use and the use of others to whom he intended to sell it, certain property of the United States, to wit, lumber specifically described therein, of the approximate value of $1006.01.

Beus and Froggett operated a trucking business at Ogden, Utah. In their employ were Percy Petersen and Reed Petersen. Loney requested Froggett to ascertain if the Roy Lumber Company desired to purchase lumber and furnished Froggett with a memorandum of the kinds of lumber he could supply. Froggett contacted the Roy Lumber Company and ascertained that they desired to purchase lumber and arrived at a price satisfactory to Loney. On a Sunday morning in November, 1942, at the direction of Froggett, each of the Petersens drove a truck to a railroad car spotted on the siding in the Quartermaster's yard. The car was open and partly unloaded. It contained lumber belonging to the United States. Loney and Froggett were at the car. At Loney's instructions, the Petersens loaded the two trucks with lumber from the car. Between 8,000 and 10,000 feet of 2 x 4's and flooring were loaded on the trucks.

While the trucks were being loaded, Major Treman drove through the yard and was surprised to find the trucks being loaded with 2 x 4's from the railroad car. He made inquiry of Loney and the latter satisfied Major Treman that the lumber was being hauled for government use. Major Treman did not give his consent for Loney to take the lumber for his own use or to sell it to others.

The two truckloads of lumber were delivered to the Roy Lumber Company. The trucks did not proceed through the south gate, which would have been the direct route to the Roy Lumber Company, but went out the north gate of the Area, traveled westerly for a distance, and then proceeded south to the Roy Lumber Company.

Froggett received payment from the Roy Lumber Company for the two truckloads of lumber and other lumber furnished by Loney and sold by Froggett to the Roy Lumber Company. Froggett credited part of the amounts received on a loan he had made to Loney and paid Loney the balance in cash.

Most of the lumber covered by the several counts of the indictment on which Loney was found guilty was sold by him through intermediaries. The intermediaries received checks in payment for the lumber sold. In most instances, Loney insisted that the intermediary cash the check and pay him his part in cash.

Loney admitted that he was present at the Quartermaster's yard and directed the loading of the lumber from the car into the two trucks; that between 2,000 and 3,000 feet of lumber were loaded. His explanation was that he obtained the lumber from the railroad car in the Quartermaster's yard as scrap and paid for it on the basis of $1 per load. There is nothing in the record to indicate any practice to take lumber directly from the cars and place it in salvage piles for sale at $1 per load.

The Roy Lumber Company paid between $34.75 and $55.00 per thousand feet for the lumber. Mr. Brown of the Roy Lumber Company testified that the two truckloads of lumber were paid for by him at current prices and that it was up to the grade, new and unused; that there was no scrap in it, no split boards, no discards or culls. Reed Petersen testified that it was green lumber but that it was good lumber. Percy Petersen testified that it was green lumber and was warped.

The court instructed the jury, in substance, that Loney had testified that the lumber which was taken from the railroad car in the Quartermaster's yard was unfit for government use and belonged to a class that would be rejected by the government, and that instead of hauling it to salvage piles he took it directly from the car and sold it as salvage lumber. The court instructed the jury that if Loney so disposed of the lumber, acting in good faith and in the belief that he had the right so to do, it should find him not guilty on count 19. There were no exceptions to the charge and counsel for Loney did not request the court to submit to the jury the issue of whether the United States, through Major Treman, consented to Loney taking the lumber covered by count 19.

Counsel for Loney assert that there was no evidence that such lumber was owned by the United States. Major Treman testified that it "was lumber purchased by the Quartermaster, being delivered to the Quartermaster's Yard." He had theretofore testified that the lumber in the Quartermaster's yard was purchased outright by the United States, through the Quartermaster, in carload shipments. Thus, it will be seen there was ample evidence to

justify the jury in finding that the lumber covered by count 19 belonged to the United States.

Counsel for Loney contend that the conviction on count 19 cannot stand because Loney took the lumber covered by that count with Major Treman's consent. That contention was not made in the trial court.

One of the essential elements of larceny is that the taking be by trespass, that is, without the consent of the owner.[2]

Where a person intending to steal another's personal property obtains possession of it, although by or with the consent of the owner, by means of fraud or through a fraudulent trick or device, and feloniously converts it pursuant to such intent, the owner will be regarded as having retained constructive possession. Hence, in such cases the conversion constitutes a trespass.[3]

The foregoing rule is not applicable where the owner, although induced by fraud, intends to and does part voluntarily with his title to the property, as well as his possession thereof, not expecting the property to be returned to him or to be disposed of in accordance with his directions.[4]

Loney satisfied Major Treman that the lumber being loaded from the car in the Quartermaster's yard was to be used for government purposes. There was no evidence that Major Treman consented that the title of the United States should pass to Loney. On the contrary, he testified that he did not consent that Loney should take the lumber for his own use or for the use of another. We are of the opinion that the evidence established that the taking charged in count 19 was against the will and without the consent of the United States.

Loney filed a motion for a new trial in which he set up, among other grounds, alleged misconduct of the jury. In support of his motion, Loney filed an affidavit of one of the jurors which averred, in substance, that while the jury was deliberating on its verdict, he stated he would not agree to a verdict of guilty unless the remaining jurors could show him specific evidence of ownership in the United States of the property taken; that some of the jurors argued there must have been evidence sufficient to convict or the court would not have submitted the counts to the jury; that one of the jurors suggested that they compromise by finding Loney guilty on certain counts and not guilty on other counts; that after eight hours of discussion the jury went through the form of verdict and filled in guilty as to some counts and not guilty as to others, "without there being any reason given . . for the action in any specific count."

Where a defendant is charged by two or more counts in an indictment, consistency between the verdicts on the several counts is not necessary.[5]

The general rule is that an affidavit of a juror will not be received for the purpose of impeaching his own verdict.[6] The reason for the rule is stated in McDonald v. Pless, 238 U.S. 264, 267, 268, 35 S.Ct. 783, 784, 59 L.Ed. 1300, as follows:

"The rule is based upon controlling considerations of a public policy which in these cases chooses the lesser of two evils. When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what had happened in the jury room.

"These two conflicting considerations are illustrated in the present case. If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defend-

---

2 United States v. Patton, 3 Cir., 120 F.2d 73, 75.

3 Beck v. United States, 62 App.D.C. 223, 66 F.2d 203, 204; John v. United States, 65 App.D.C. 11, 79 F.2d 136, 137; Bimbo v. United States, 65 App.D.C. 246, 82 F.2d 852, 855; Talbert v. United States, 42 App.D.C. 1; Hagan v. State, 76 Okl.Cr. 127, 134 P.2d 1042, 1047, 1049; People v. Delbos, 146 Cal. 734, 81 P. 131, 132; 32 Am.Jur., Larceny, § 29, p. 915.

4 United States v. Patton, 3 Cir., 120 F.2d 73, 75; Kent v. State, 66 Ga.App.

147, 17 S.E.2d 301, 303; 32 Am.Jur., Larceny, § 30, p. 918.

5 Garrison v. Hunter, 10 Cir., 149 F. 2d 844; Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161.

6 McDonald v. Pless, 238 U.S. 264, 267–269, 35 S.Ct. 783, 59 L.Ed. 1300; Bateman v. Donovan, 9 Cir., 131 F.2d 759, 764; Manhattan Oil Co. v. Mosby, 8 Cir., 72 F.2d 840, 847.

Cf. Southern Pac. Co. v. Klinge, 10 Cir., 65 F.2d 85.

ant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict. But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harrassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference."

■ Since the judgment on count 19 must be affirmed, and the sentences run concurrently, errors assigned with respect to the remaining counts are nonprejudicial and need not be considered.[7]

The judgment is affirmed.

---

[7] Brooks v. United States, 267 U.S. 432, 441, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407; Fisher v. Schilder, 10 Cir., 131 F.2d 522, 524; Smith v. United States, 10 Cir., 38 F.2d 632, 633.