## COLLIER et al. v. UNITED STATES.
### No. 11320.

United States Court of Appeals
Sixth Circuit.

July 10, 1951.

Ben C. Welch, Memphis, Tenn., for T. O. Balsinger.

Hugh K. Davidson, Detroit, Mich., for Hugh K. Davidson.

Thomas C. Farnsworth, Memphis, Tenn. (John Brown, Thomas C. Farnsworth, and Charles G. Black, all of Memphis, Tenn., on the brief), for appellee.

Before SIMONS, MARTIN and McALLISTER, Circuit Judges.

MARTIN, Circuit Judge.

The two appellants, Collier and Balsinger, were convicted on a two-count indictment charging them jointly with violation of the National Motor Vehicle Theft Act, commonly called the Dyer Act, 18 U.S.C. §§ 2312 and 2313. On appeal from the judgment of sentence entered on the jury's verdict, they assert that reversible error was committed by the trial judge in declining to grant their respective motions for directed verdicts of not guilty.

The first count of the indictment charged that the two accused men, knowing the motor vehicle, a Ford coach, to have been stolen, transported it in interstate commerce from East Alton, Illinois, to Trenton, Tennessee. The second count charged that they received, concealed, bartered and sold the stolen motor vehicle, which was moving in interstate commerce between the aforementioned places, and that they then knew the motor vehicle to have been stolen.

Appellants state that the precise question presented is whether the Ford automobile was a stolen vehicle at the time they admittedly transported it from East Alton, Illinois, to Trenton, Tennessee. They insist that the car was not a stolen vehicle at the time, for the alleged reason that they had not committed larceny in obtaining it. They contend that both possession of the vehicle and the property interest therein had been voluntarily turned over to Collier by Leland Turner, who had bought the car upon a conditional sales contract with title reserved in the seller. There was conflict in the testimony of Turner and that of the two appellants as to the conditions upon which Turner delivered the car to Collier.

The credibility of the witnesses was, of course, a question for the jury; and the jury had the right to accept as true

Turner's version of the transaction. His testimony, therefore, will be first reviewed.

In August, 1948, Turner had purchased from Cassens and Sons a 1941 Ford Coach under a conditional sales contract. He had made a down payment of $350 and had assumed to pay $846 more in eighteen consecutive equal monthly instalments of $47. Becoming unemployed in early 1949, he found it difficult to continue paying the monthly instalments so he requested Cassens and Sons to permit him to attempt to dispose of the automobile. Permission was granted him to do so. Whereupon, he went to several used car lots in Alton, Illinois, but was unable to find anyone who would pay him as much for the car as he owed on its purchase price. Finally, on either a Friday or a Saturday early in February, he went to Dailey's used car lot in Alton, where he met and discussed a possible sale with Collier.

Collier told him that he would have to talk to his brother. Later, he telephoned Turner to bring the automobile out to the Blue Moon Cafe so that his brother could see it. Turner complied and talked to Dailey, who "was supposed to be" Collier's brother. Dailey did not buy the automobile; but, on the next day, Collier telephoned Turner and asked him to bring the automobile over to the used car lot, which he did. Thereupon, Collier informed Turner that he would buy the car from Cassens and "pay it off" for him, and that he would give Turner ten or fifteen dollars over and above what he owed Cassens. Collier also promised Turner a job on the used car lot and instructed him to report for work on the morning of the next day—Monday.

Collier furnished Turner a car in which to drive back and forth until he could get on his feet. Turner left with Collier the Ford automobile which he was trying to sell. Questioned as to whether Collier asked him to sign a bill of sale, Turner replied in the negative, stating that "he just asked me to sign a paper, to leave my name there, you know, where he would remember my name to pay it off." Turner said he signed a paper with no writing or printing on it, to which he paid little attention. He admitted his signature when shown a purported bill of sale, however; but said that Collier did not tell him that it was a bill of sale. He insisted that when he signed the piece of paper there was no writing on it. On cross-examination, he was asked if, when he left the Ford automobile with Collier, the understanding was that Collier would sell it for him. He replied in the negative, saying that the understanding was that Collier would "pay Cassens and Sons off" and that he would sell Collier the automobile. He swore that Collier was supposed to go on the next day, Monday, "pick up the title" on the automobile and "pay Cassens off"; and that he did not expect the automobile to be returned to him if Collier bought it. When Turner went to the used car lot on Monday, Collier was not there, for he and Balsinger had left for Tennessee with Turner's Ford car. Moreover, Turner did not get the promised job.

Collier, testifying in his own behalf, said that Turner gave him a bill of sale in the presence of Balsinger and voluntarily turned the car over to him; and that he thought the car was worth what Turner owed on it. He said that he told Turner: "I will try and sell your car for you, or I might take it myself, and if I do, I will pay off the balance. And if I sell it, I will pay it off, and whatever it is sold over that I will keep it." He said that the transaction occurred on Sunday, and that he told Turner to report for work on Tuesday morning; and that he let Turner take a car for use in the meantime, as mechanics working for Dailey always had some kind of transportation.

Collier testified that, after he received Turner's automobile, he and a friend who had a station wagon and trailer decided to take the cars out of town because the market was higher, sell the motor vehicles and return and pay for them, making whatever profit accrued from the transactions. He said that he and Balsinger transported Turner's Ford automobile to Trenton, Tennessee, after Balsinger had obtained Tennessee registration for the vehicle in Collier's name, and sold it for $450 to a filling station operator, McCann. He stated that he would not let Balsinger sell the station

wagon because the offers for it were insufficient to pay the man from whom they had procured it, and that it was left with Balsinger in Memphis, to which city they went from Trenton. He declared that Balsinger said he would "pay the mortgage off on the Ford and give the station wagon back to its owner, or sell it and give him the money." Collier asserted that he had intended to stay in Memphis for a while, but that, business being bad, he went on to California with a man and wife who were with him and Balsinger. He admitted that he has never paid anything on the Ford automobile, which he procured from Turner.

Balsinger was arrested in Memphis. His testimony disclosed that he happened to be on Dailey's used car lot on the Sunday when the deal between Turner and Collier was consummated, and that a bill of sale was signed by Turner in his presence. He said that he was in the employ of a half brother of Collier's employer, Dailey. Balsinger left with Collier for Tennessee on the Sunday night after Turner had signed the paper. The two men stopped at Union City, Tennessee, where Balsinger bought a Tennessee license, issued in Collier's name, in the County Register's office. He signed Collier's name to the registration receipt. They proceeded from Union City to Trenton, and drove into a filling station to have a flat tire repaired and to buy gasoline.

After five or ten minutes' conversation with McCann, the filling station operator, Balsinger sold him the Ford car for $450, which was $150 less than the amount owed on it by Turner to Cassens and Sons. McCann gave him a check for the $450, payable to Collier, which with the latter's permission he endorsed and had cashed by the Trenton Produce Company to which he was identified by McCann. Balsinger said that he wired his wife $300 of the proceeds of the sale, gave Collier some $25, and kept the rest of the money for their expenses. He admitted that he knew there was a mortgage of some $600 on the Ford automobile sold by him; that he has made no payment on it; and has made no restitution whatever. He stated that he had discussed with Collier the sale of the automobile. Asked if, knowing that Turner owed around $600 on the Ford car, he nevertheless went from Illinois to Trenton, Tennessee, and sold it for $450, he admitted that he did. The district attorney questioned him: "And you were going to take the $150 out of your own pocket and pay Mr. Turner back?" He replied: "Well, no, he would settle for less than that." On the day after the Ford was sold to McCann, Balsinger's wife came to Memphis to bring some clothes belonging to her husband and to Collier. She was driven by a man named Bowers, who came down in the automobile of Carr, with whom Collier went to California.

McCann testified that Balsinger introduced himself as Collier. He verified in substance the sale transaction as related by Balsinger and said that the latter handed him "something, bill of sale, I reckon it was." McCann traded the Ford for a Pontiac and $250 in cash. He testified that, after he found out that he had purchased a "stolen car," he knew that he had "to satisfy" the man to whom he had sold it. He paid $300 to representatives of Cassens and Sons who came to Trenton and gave him a certificate of title to the Ford automobile.

We are of opinion that the district judge properly submitted the case to the jury and that there was substantial evidence to support the conviction of the accused for violation of the Dyer Act. Moreover, the jury was fully and clearly instructed as to the relevant law. No exceptions were taken to the charge, but there being no reversible error inhering in it any exceptions noted would have been invalid. The court's instructions were clear and adequate. They fully and rather favorably protected the appellants' rights. The statute was carefully explained, the burden of proof which the government was compelled to carry in order to convict was elucidated, and the substantive law in relation to the proof adduced was explicitly stated. Important portions of the court's charge are, for the sake of space economy, set forth in the margin.[1]

1. "The Court instructs you that, ordinarily, to be guilty of larceny there must be a trespass or a taking without consent of the owner. However, where a person

■ Assuming Turner's testimony to be true, as we must since the jury evidently accepted it, he had no intention whatever of parting with his equitable title to the Ford automobile when he turned it over to Collier, but delivered possession upon the express understanding that Cassens and Sons would be paid the balance due by Turner on the purchase price of the automobile. Indeed, Turner testified that he intending to steal another's personal property obtains possession of it, although by or with consent of another by means of fraud, or through a fraudulent trick or device, and feloniously converts it pursuant to such intent, the owner would be regarded as having retained constructive possession so that the conversion constitutes a taking by trespass as an element of larceny.

"If you find the defendants in this case had it in their minds or intended to steal the automobile in question here, and obtained possession of it with the consent of Mr. Turner, the owner, by means of fraud, or through a fraudulent trick or device, and pursuant to such intent feloniously converted it to their own use, the Court instructs you that the owner, Mr. Turner, will be regarded as having retained constructive possession of the automobile and that the defendants, in so obtaining possession of it, did so unlawfully, and were guilty of larceny.

"The Court instructs you that the rule, standing alone, that the owner is regarded as having retained constructive possession of property which was taken from his possession by means of fraud, trick or device, does not apply where the owner, although induced by fraud, intends to and does part voluntarily with full title to property, as well as possession thereof, that is, where he does not expect the property to be returned to him or where he expects it to be disposed of in accordance with his directions.

"So if you find Mr. Turner, the owner of the automobile in question, although induced by fraud, intended to, and did, part voluntarily and fully with his title to the property, as well as his possession thereof, not expecting the property to be returned to him, or to be disposed of in accordance with his directions, you will find the defendants, or neither of them, have not been guilty of a larceny or unlawful taking within the purview of the statute on which the indictment herein is based, and they should be acquitted.

\*　　\*　　\*　　\*　　\*　　\*

'More particularly it is the theory of the Government that Mr. Turner, on the alleged fraud or fraudulent representations of the defendant Collier, left the automobile in question with the latter to be disposed of, whereby the Cassen Company would be immediately paid an in-debtedness against the car held by it, and the balance, a small amount, paid over to Mr. Turner. That the defendant Collier did not act in good faith in the procurement of Mr. Turner's car, but acted fraudulently and obtained the same through fraud, trick and device, with it in mind at the time that he would defraud Mr. Turner and others financially interested in the car. That the owner, in parting with possession of his car, did so expecting the car would be returned to him if the agreement aforesaid did not go through, and further, there was no transfer of title or sale of the car to the defendant Collier.

"Further, with respect to the defendant Balsinger, the Government contends that he was present when the deal aforesaid between Mr. Turner and his co-defendant, Collier, was consummated, and that he, in effect was a party to same and that he had full knowledge of the transaction and participated in the transportation and disposal of the car in violation of the statute of this case.

"If you believe the Government's theory with respect to either, or both, of these counts in the indictment has been proven beyond a reasonable doubt, it will be your duty to convict the defendants and report to the Court accordingly.

"The defendants, and each of them, deny the matters and things charged against them in the indictment. First of all, they deny that they have transported or participated in any way in the unlawful transportation of the car in question, or that they received, concealed, bartered or sold same in violation of the law.

"They deny they obtained the car in question with the unlawful and fraudulent intent to steal the same and deprive the true owner, Mr. Turner, of same. It is the defendants' contention that the car was bought legitimately and in good faith from the owner, Mr. Turner, and that he parted with his full title and possession of same as in any other sales transaction, and that if either of them are responsible at all, it is only by reason of the fact that certain moneys may be owing the Cassen Company and Mr. Turner. In other words, that there exists only the relationship of debtor and creditor between the parties, and that a larceny has not been perpetrated within the

thought Cassens had the title to the car, and that the reason why he could not personally be paid was because of that fact. So, he was induced by the fraudulent misrepresentations of Collier to sign what developed to be a bill of sale, though he swore that he did not know it to be such.

The quick get-away from Illinois to Tennessee of Collier and Balsinger after obtaining possession of the Ford automobile; their speedy registration of it at Union City, in Tennessee, shortly after they arrived in that state; the misrepresentation by Balsinger that he was Collier and his signing his name as such to the Tennessee license receipt and the endorsement by him of Collier's name on the check issued by McCann, payable to Collier's order; the sale of the automobile to McCann for $150 less than was due on it to Cassens; the prompt arrival of Balsinger's wife at Memphis with her husband's and Collier's clothes immediately after she had received from her husband $300 of the proceeds of the sale by him of the automobile in question; and the flight of Collier to California, as well as other circumstances narrated: all indicate plainly the guilty intent of Collier and Balsinger to steal the motor vehicle and transport it across the state line from Illinois to Tennessee in violation of the Motor Vehicle Theft Act.

■ This court, in Davilman v. United States, 6 Cir., 180 F.2d 284, 285, approved the construction of Judge Miller, then district judge but now a member of this court, in United States v. Adcock, D.C.W.Ky., 49 F.Supp. 351, 353, that the word "stolen" as used in the Dyer Act is not used in the technical sense of what constitutes larceny, but in its well known and accepted meaning of taking the personal property of another for one's own use without right or law; and that such taking can exist whenever the intent comes into existence and is delib-

erately carried out regardless of how the person so taking the automobile may have originally come into possession of it.

In United States v. Sicurella, 2 Cir., 187 F.2d 533, 534, Judge Augustus N. Hand, writing an opinion affirming convictions for conspiracy to violate the Dyer Act, declared: "Defendants say that a conviction under the Dyer Act cannot stand unless there is evidence sufficient to prove larceny under the narrowest definition of that crime at common law. Such a contention would not help the defendant even if it were sound—which we do not intend to intimate—for a narrow common law definition is not required under the Dyer Act." Our opinion in Davilman v. United States, supra, was cited as authority.

When carefully analyzed, none of the following cases cited by appellants is, to our thinking, in conflict with the view which we expressed in the Davilman case. Loney v. United States, 10 Cir., 151 F.2d 1; Hite v. United States, 10 Cir., 168 F.2d 973, 975; United States v. Patton, 3 Cir., 120 F.2d 73. In the Loney case, a conviction of larceny of government property was affirmed. In the Hite case, it was stated that the victim voluntarily parted with both title and possession of the automobile, not expecting it to be returned to him or disposed of in accordance with his directions. On the contrary, in the instant case, Turner testified that he had expected the Ford automobile which he delivered to Collier to be disposed of in accordance with his directions and understanding. In the Patton case, the defendant was convicted of entering a national bank with intent to commit larceny and of larceny from the bank. The statute involved and the facts in that case differentiate it plainly from the case at bar.

The judgments are affirmed.

meaning and intent of the Dyer Act under which this case is being prosecuted.

"If you believe this to be the fact, or if you find there was no larceny and intent in the first instance to obtain title and possession of the car through fraud, trick or device, you will find for the defendants on both counts in the indictment and report to the Court accordingly."