**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Stan LEAVITT, Glen Leavitt, and Lee Johnson, Defendants-Appellants.**

**Nos. 78–1164, 78–1165 and 78–1166.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 24, 1979.

Decided April 23, 1979.

Max D. Wheeler, Asst. U. S. Atty., Salt Lake City, Utah (Ronald L. Rencher, U. S. Atty., Salt Lake City, Utah, on brief), for plaintiff-appellee.

Jackson Howard of Howard, Lewis & Petersen, Provo, Utah (Robert C. Fillerup of Howard, Lewis & Petersen, Provo, Utah, on brief), for defendants-appellants.

## OPINION ON REHEARING

Before McWILLIAMS, DOYLE and McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is an appeal from judgments based on jury verdicts convicting Stan Leavitt, Glen Leavitt and Lee Johnson of theft from the government. The counts were the same in form. Each alleged that on the day in question, three defendants did willfully and knowingly embezzle, steal and purloin saw logs having a value in excess of $100.00 and being the property of the United States, having been cut from the Uinta National Forest, Wasatch County, Utah, contrary to 18 U.S.C. § 641 and 18 U.S.C. § 2. The date of each count was different. Count I charged that the offense occurred on July 20, 1976; Count II on July 21, 1976; Count III on July 22, 1976; Count IV on July 23, 1976; Count V on July 27, 1976; and Count VI on July 28, 1976.

Defendants-appellants seek reversal generally on four contentions which are delineated below. The emphasis is on what might be described as the legal impossibility theory which is bottomed on the argument that the contract terms are such that the government agreed to have title passed to the Leavitts almost instantly at the scene of the timbering. From this it is contended that since the logs are no longer government property, there could be no conversion or intent to steal. The other alleged errors are trial ones which will be considered hereinafter.

Although there is some suggestion in the briefs that the evidence was insufficient, this is not particularly asserted.

Our conclusion is that the legal impossibility concept was not established by the contract, any implied agreement or the circumstances. Also, we conclude that the evidence is amply sufficient to support the

charges. Evidence of two of the defendants' confessions or admissions were introduced in evidence, and although much of the evidence is circumstantial and depends upon the drawing of inferences, these circumstances are strong and sufficient. Also, there were observations by government agents which corroborated the Forest Service's theory of the case.

The three defendants were employees of Leavitt Lumber Company of Kamas, Utah. Kamas is located in the Wasatch Mountains, some 35 miles east of Salt Lake City, Utah. At the time of the offenses charged, the company's main activity was the harvesting and processing of timber which was purchased from the United States Forest Service.

The predecessor of Leavitt Lumber was Greys River Lumber Company which was commenced by Dale Leavitt, the father of Stan and Glen Leavitt. Two other sons, Lynn and Kent, operated a mill in Alpine, Wyoming, and called it Greys River Logging Company. Stan and Glen Leavitt operated the Leavitt Lumber Company at Kamas. Stan Leavitt was the president of the Kamas mill. Dale Leavitt was the vice-president, and Glen Leavitt was the secretary. The defendant-appellant Lee Johnson was employed by the Kamas mill as a truck driver.

The pertinent statutes are 18 U.S.C. § 641 which provides:

*Public money, property or records.* Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, * * * any record, voucher, money, or thing of value of the United States or of any department or agency thereof, * * * [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

and 18 U.S.C. § 2, which defines principal and accessory before the fact:

*Principals.* (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The trial commenced December 8, 1977, and ended December 13, with the return of guilty verdicts by the jury. Sentencing was completed on January 25, 1978. Judge Fred Winner pronounced the sentences.

The contract dated December 31, 1973, between the government and Leavitt Lumber Company described the relationship of the sale and gave direction to the legal conclusions. It was a standard form Timber Sale Contract. It provided for the purchase of so-called "Shingle Mill" or "Shingle Mill Hollow" timber by the company from the government.

The Forest Service had designated and marked the trees for the sale. A total of 1740 trees were selected for harvesting. These included the diseased, dead and overmature ones. To advertise the sale, the Forest Service calculated the number of board feet to be sold, or an "initial estimate" of the volume of board feet.

The initial estimate made by the Forest Service involved a random selection for measurement of a group of trees. Measurement was taken around the base of those selected and a calculation was made of the estimated height of the tree. From that, there was an estimator who determined the probable gross board feet of each tree. A defect factor was deducted in order to take disease into account. This defect factor was derived from published tables in the National Forest Service Scaler's Handbook.

After the computations, the Forest Service arrived at an initial estimate of 1,000,000 board feet or 1,000 M.B.F., which means thousand board feet. Following the advertisement for bids, a contract was awarded to the highest bidder, Leavitt Lumber Company.

Leavitt Lumber Company commenced logging operations in June 1976. The cutters would fell the trees and then would cut them into 33 foot lengths. The "skidders" would skid or drag the timber from the place where it was cut to the "landings" where it was stacked and made ready to load in the trucks. A mechanical loader picked the logs up and placed them on the individual trucks. Glen Leavitt did the loading on the Shingle Mill sale. In addition, there were two truck drivers, Lee Johnson, and another person who hauled the loads of logs to the mill site at Kamas. Stan Leavitt, the president of Leavitt Lumber, was in charge of the operation at Kamas.

The Forest Service devised a "scaling" system to attempt to achieve a more accurate measure of the amount of timber being hauled by the purchaser. The system was called a "random truck load scale system," the operation of which is here described:

The Forest Service made out a series of tickets numbered 2300 through 2399 for the first segment of the sale. Each ticket was divided into three parts, with the top and the second part being identical. At the bottom of each ticket was a small stub which was detachable from the two identical tickets. Using a random number table, the Forest Service selected 20 out of the 100 numbers to be scaled by the Forest Service. The bottom stub of each ticket was either marked as a scale or a non-scale load based on the random number table. The bottom half was then torn off and deposited in a small envelope marked with the corresponding load number. Load 2314 was a scale load and so the bottom part of the three-part ticket for load 2314 was circled as a scale load. The small stub was then torn off and deposited in an envelope marked 2314. The hundred envelopes had a hole punched in the top and were assembled on a wire loop which was then bolted and padlocked in a ticket box. The ticket box was then fastened to the outside of a building at the mill in Kamas. The purchaser was not made aware of which loads were to be scaled.

As each truck was loaded, the loader marked on the duplicate ticket, corresponding to the number, a count of logs loaded, the driver of the truck, and so on. One duplicate ticket was then detached and given to the driver of that load. In addition, the loader was to climb on the load of logs and paint the corresponding load number in two places, the upper and lower front left-handed corners of the load. Thereafter, the driver hauled the logs to the mill site. Upon arriving there, he went to the ticket box, pulled the envelope with the corresponding number, ripped the envelope open and examined the stub inside. If the load was non-scale, the driver could dump the load in the purchaser's log yard. If the load was marked "scale," the driver was to dump the load in an area where the Forest Service told the purchaser to stack the scale loads.

In June 1976, the logging operations were started. In the first 90 loads, there were 19 scale loads. As the loads were hauled to the mill site in Kamas, they were dumped in the corresponding areas, and the scale loads were scaled at approximately two-week intervals by a Forest Service scaler. The amount shown on the scaler's report was multiplied by five to calculate the amount of timber that had been cut and removed for the monthly billing report. The amount was then used to compute the value of the timber.

The Forest Service employee who made the calculations to determine the initial volume and who set up the sale, examined the scale loads and became concerned because one of them had only 800 net board feet. Based on his determination that the scale loads were lower than he anticipated, he requested an investigation to examine the operations.

The government's evidence showed that certain loads of logs were either scale loads which had been intentionally reduced in volume or loads hauled with the same load number. The government maintained that Leavitt Lumber had accounted for 342,000 board feet as having been hauled, whereas the Forest Service measured only 387,000

board feet remaining after this timber had been removed from the sale area. This suggested that the defendants had converted 271,000 board feet of timber worth approximately $29,000. Defendants maintained that there were mathematical errors in the Forest Service's method of calculation and this was due in part to the fact that there was variety in the types of scale loads.

The government never identified any specific logs which it claimed were stolen, but the government witnesses, who conducted the surveillance, did identify specific load numbers as the duplicate or shorted loads. In addition, the government introduced photographs of some of the loads. The six counts in the indictment represented six specific loads that were duplicated or shorted on the specific dates indicated. The government throughout the transaction maintained close scrutiny and documented duplicate and short loads carefully. As a result, there was strong corroboration of theft in addition to any mathematics.

The points advanced by the defendants which we discuss are:

First, that there cannot be guilt of theft because under the terms of the contract, Leavitt Lumber had both title and possession of the saw logs at the time of the alleged crime. Since the government had divested itself of any property interest, there could not be a conversion of government property.

Second, that the trial court erred in allowing the government to bring out testimony that Lynn Leavitt, a son who was a non-party, had pled nolo contendere to the charge of theft of two government logs at the Leavitt site in Wyoming.

Third, that the court erred in allowing an expert witness to testify regarding certain envelopes which had not been put into evidence prior to his testimony.

Fourth, that the trial judge showed bias and prejudice against the defendants and their counsel so that a fair trial was denied.

I.

THE ISSUE OF LEGAL
IMPOSSIBILITY

The alleged impossibility is founded on the legal concept or theory that the government did not have ownership of the logs at the time of the alleged theft. The argument is that title had passed to the Leavitt Lumber Company, whereby it became the owner of the logs taken from the designated areas. Since the logs did not belong to the government, there could not have been a theft.

We must first examine the relevant part of the contract which states:

All right, title, and interest in and to any Included Timber shall remain in Forest Service until it has been cut, Scaled, removed from Sale Area or other designated cutting area and paid for, at which time title shall vest in purchaser. For purposes of this Subsection, timber cut under cash deposit, Effective Purchaser Credit or payment guarantee under B4.3 [surety bond provision] shall be considered to have been paid for.

The defendants say that the surety bond of $30,000 together with a performance bond of $5,000 had the effect of bringing about payment and transfer of title.

This issue of ownership was presented to the trial judge who ruled that the defendants could contest the government's claim of ownership as part of their defense. The court instructed the jury that the government had to prove that the stolen property was that of the United States.

■ Where, for example, a duplicate load was removed and was not reported, there would not be timber cut "under a bond." Such a load would never be included on any billing and would then *never* be paid for. Hence the title could not possibly be in law or fact transferred from the government. Furthermore, the contract above quoted provided that title did not pass in any event until the log was removed from the sale area. When there was a duplicate load, the theft occurred before removal from the sale area, and there was no way that the title

could have passed under the terms of the contract. The same would be true of intentionally shorting a scale load. The theft occurred before removal from the sale area, and the amount shorted would never be paid for. Hence the transfer of title theory fails. Ownership remained in the government.

The next legal theory raised is that the government gave consent to the defendants to remove the property. As a result, the argument is made that there was no trespass and consequently no theft. Defendants say that only if they were shown to have removed trees from the forest other than those marked by the Forest Service could they have been guilty of theft. The government's response is that the consent was limited to the taking of logs in accordance with the terms of the contract, and that consent was not given to removal with an intent to steal or embezzle.

The decision of this court in *Loney v. United States,* 151 F.2d 1 (10th Cir. 1945), was reached in the context of a similar statute, 18 U.S.C. § 82. The distinction was made that there was not consent by the government where the defendant took possession of property which had been obtained by fraud.

The Supreme Court in *Morissette v. United States,* 342 U.S. 246, 271, 72 S.Ct. 240, 96 L.Ed. 288 (1952), expressed a disinclination to employ distinctions based on the common law definition of crimes, whereby loopholes or gaps would be created in the statutes. Here the indictment charged embezzlement, stealing and purloining. In *Morissette,* the term "stealing" was broadly defined. It was not limited to the common law definition. The opinion did speak of conversion and stated that it (conversion) may be consummated without intent to keep and without a wrongful taking. 342 U.S. at 272, 72 S.Ct. 240. To steal has been said to include taking of property by larceny, embezzlement or false pretenses. *United States v. Turley,* 352 U.S. 407, 412, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957).

■ Therefore, the fact that there was a consent to allow property to be in the possession of the defendants for lawful purposes does not constitute consent by the government for the defendants to steal, convert or even purloin such property.

We do not read our decision in *United States v. Speir,* 564 F.2d 934, 937–38 (10th Cir. 1977), *cert. denied,* 435 U.S. 927, 98 S.Ct. 1495, 55 L.Ed.2d 521 (1978), as showing any tendency to adopt strict common law definitions. That case merely held that intent continued to be an element of conviction under 18 U.S.C. § 641. This was also true of *Morissette. Speir, supra,* upheld the conviction of stealing government property (Christmas trees from the national forest). The fact that the defendant in *Speir* knew that the property did not belong to him proved the requisite intent.

The opinions of another circuit are not inconsistent with the view which we here adopt. *See United States v. Cedar,* 437 F.2d 1033 (9th Cir. 1971); *Magnolia Motor Logging Co. v. United States,* 264 F.2d 950 (9th Cir. 1959), *cert. denied,* 361 U.S. 815, 80 S.Ct. 54, 4 L.Ed.2d 61 (1959). Both of these were prosecutions under § 641, *supra.*

We conclude that contractual consent by the government for the defendant to possess the logs has no tendency whatever to waive defendants' liability for theft.

■ The related contention of the defendants that the government did not have a criminal case and was limited to an action for breach of contract lacks merit. They rely on *United States v. Johnston,* 268 U.S. 220, 45 S.Ct. 496, 69 L.Ed. 925 (1925), wherein the Supreme Court held that the defendant could not be convicted of embezzlement of United States money. This case arose under the Federal Revenue Act. Defendant owed excise tax and was a debtor rather than a bailee. The tax was collected on admissions to boxing exhibitions. It was said that since, under the statute, the money did not belong to the United States at the time of the collection, and since the United States merely had a claim for the debt, it could not be an embezzlement. A conviction under the Revenue Act for willful failure to pay the tax was upheld.

*Johnston* was not governed by the conclusion that a debtor relationship existed. The decision was because the tax money had not been identified as United States property. This was clarified in a Ninth Circuit interpretation of the *Johnston* decision in *United States v. Dupee*, 569 F.2d 1061 (9th Cir. 1978). There the defendant sold postal money orders and failed to turn the money collected into the postal service. The defendant contended that he was not guilty of embezzlement because he was simply a debtor. The Ninth Circuit rejected this. It reasoned that the money collected became the property of the United States at the moment of the collection.

Our situation is not dissimilar from that in *Dupee*. Here the defendants were charged with taking logs, not money. It is even more clear here that the logs belonged to the United States at the time of conversion.

We have also considered the argument that there was a failure to prove that the value of the logs exceeded $100.00. We reject this.

## II.

DID THE TRIAL COURT ERR IN ALLOWING THE PROSECUTOR TO CROSS-EXAMINE DALE LEAVITT ABOUT THE ENTRY BY ONE OF HIS SONS, LYNN LEAVITT, OF A NOLO CONTENDERE PLEA TO THE CHARGE OF STEALING TWO LOGS IN WYOMING?

The dispute as to admissibility was conducted outside the presence of the jury. Objection was made by the defendants that receipt or acceptance of the evidence would violate Rule 609 of the Federal Rules of Evidence and that the prejudice far exceeded the probative value. The court ruled that the plea was admissible for purposes of impeachment. On appeal, it is contended that the use of this evidence also violated Rule 410 of the Federal Rules of Evidence and Rule 11(e)(6) of the Federal Rules of Criminal Procedure.

The court's decision to accept this evidence for the purpose of testing the credibility of the witness Dale Leavitt was not justifiable. The credibility of Lynn Leavitt was not in issue. Dale Leavitt was the witness and the nolo contendere plea by his son Lynn fell short of discrediting Dale as a witness.

Our view of the surrounding facts is that the defense contended that the shortages which the government relied on to establish the conversions were the products of miscalculations or high estimates by the government. The United States Attorney was seeking to establish, on the other hand, that the shortages could, in general, result from embezzlement or theft of the logs, and this particular transaction in Wyoming by Lynn Leavitt was offered presumably for the purpose of dramatizing this aspect.

We conclude that the use of the plea was irrelevant to anything that was going on at the trial. It was not, however, a conviction or quasi conviction of Dale Leavitt, who was the witness, or of anybody who was on trial, and so the receipt of the evidence did not constitute severe prejudice. At the same time, the United States Attorney should have refrained from making such an offering merely because the trial judge would be inclined to accept it. The lesson is clear that only evidence which was relevant to the issues being tried could be offered, and the subject item was, to say the least, lacking in evidentiary value. The plea was remote and had only the slightest tendency to suggest theft in the case being tried. However, the defense was not satisfied to reserve the error. The defense called Lynn Leavitt as a witness for the purpose of testifying regarding this plea. He said:

> I took two logs out of some scale loads that was spread that I needed for a special order that I was sawing, and I planned on returning the two logs back in, the two that I took out, two more logs of the same size which I never did get a chance to do [because he was arrested first].

Undoubtedly, the defense counsel tried to explain this nolo contendere transaction.

This effort had at least some tendency to give the nolo plea added emphasis, although admittedly the evidence at the same time suggested that it lacked cogency.

In sum, it is our conclusion that the plea as evidence did not reflect strongly on the defendants being tried in this case. In fact, as we view it, Lynn Leavitt's plea had little tendency to undermine the credibility of Dale Leavitt's testimony. Dale Leavitt was the witness from whom the answer was elicited. The strength, or lack of it, of this unfortunate testimony, which bears no logical relation to the transaction being tried, contributes to our conclusion that the quantum of prejudice fell far short of calling for reversal.

### III.

WHETHER ERROR RESULTED FROM THE EXPERT TESTIMONY OF THE WITNESS JAMES GASKILL THAT HE EXAMINED THE SCALE TICKET ENVELOPES AND DISCOVERED THAT SEVERAL HAD BEEN TORN OPEN AT THE SAME TIME

■ The testimony under attack was offered in support of the government's theory that the defendants knew the scale loads in advance of assembly and loading. The established procedure allowed only one envelope to be opened at any given time because the envelope was opened only after the truck arrived at the yard loaded with logs.

The objection to Gaskill's testimony was that there was not a proper foundation. The questions which are now argued with respect to laying a foundation prior to the expert testimony and the failure to establish a chain of evidence prior to the expert testimony, do not impress us as being worthy of attention because this is the kind of a matter that is left to the trial court's discretion. *See United States v. Carranco*, 551 F.2d 1197, 1199–1200 (10th Cir. 1977); *United States v. Harris*, 534 F.2d 207, 213 (10th Cir. 1975), *cert. denied*, 429 U.S. 941, 97

S.Ct. 359, 50 L.Ed.2d 311 (1976). The decisions cited by defendants, *United States v. Wagner*, 475 F.2d 121 (10th Cir. 1973), and *United States v. Williams*, 447 F.2d 1285 (5th Cir. 1971), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1168, 31 L.Ed.2d 231 (1972), are not persuasive. There was no denial of confrontation because all the government agents in the chain appeared as witnesses and were available for cross-examination.

### IV.

WHETHER THE TRIAL COURT'S SARCASM AND CONDUCT GENERALLY CREATED AN ATMOSPHERE THAT WAS INIMICAL TO A FAIR TRIAL FOR THE DEFENDANTS

■ The record does not disclose any particular actions on the part of Judge Ritter which of themselves carry a substantial impact. There are some quotations in the defendants' brief, but they are not individually, or as a whole, sufficient to support the argumentative conclusions that the defendants offered. The judge did manifest some lack of patience, and he at times advised defense counsel that his questions were not relevant or were cumulative and that counsel should stop pursuing them. Also, counsel was told to limit his opening statement to remarks which were proper in such a statement. Defense counsel was not affected by the "suggestions" which the trial court gave. He appeared to continue in his own fashion. Judge Ritter's conduct was not a model of judiciousness. We do not conclude, however, that it resulted in an atmosphere that created prejudice calling for reversal. There were a number of instances, on the other hand, during the trial in which defense counsel did not show acceptance of the rulings of the court in that he would just pursue the line of questioning that had already been objected to until the court gave its ruling extra emphasis.[1] Hence we must reject the plea that the cause has to be remanded for a new trial.

We affirm.

1. Mr. Howard's own selections of incidents which are included in his brief, even though not in full context, themselves demonstrate the point which is here made.